**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JOHN J. CARNEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER, FOR HIGHVIEW POINT PARTNERS, LLC, MICHAEL KENWOOD GROUP, LLC, MK MASTER INVESTMENTS LP, MK INVESTMENTS, LTD., MK OIL VENTURES LLC., MICHAEL KENWOOD CAPITAL MANAGEMENT, LLC; MICHAEL KENWOOD ASSET MANAGEMENT, LLC; MK ENERGY AND INFRASTRUCTURE, LLC; MKEI SOLAR, LP; MK AUTOMOTIVE, LLC; MK TECHNOLOGY, LLC; MICHAEL KENWOOD CONSULTING, LLC; MK INTERNATIONAL ADVISORY SERVICES, LLC; MKG-ATLANTIC INVESTMENT, LLC; MICHAEL KENWOOD NUCLEAR ENERGY, LLC; MYTCART, LLC; TUOL, LLC; MK CAPITAL MERGER SUB, LLC; MK SPECIAL OPPORTUNITY FUND; MK VENEZUELA, LTD; SHORT TERM LIQUIDITY FUND, I, LTD,<br><br>                   Plaintiff,<br><br>v.<br><br>FRANCISCO ILLARRAMENDI, MARIA JOSEPHINA GONZALEZ-MIRANDA, ADELA M. ILLARRAMENDI<br><br>                   Defendants. | Civil Action No.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

     John J. Carney, Esq. (the "Receiver"), as Receiver to the Michael Kenwood Group (the "MK Group") and certain affiliated entities (collectively, the "Receivership Entities")[1] in

---

[1] The Receivership Entities include: Highview Point Partners, LLC, MK Master Investments LP, MK Investments, Ltd., MK Oil Ventures LLC, The MK Group, Michael Kenwood Capital Management, LLC; Michael Kenwood Asset Management, LLC ("MKAM"); MK Energy and Infrastructure, LLC ("MKE&I"); MKEI Solar, LP ("MKEI Solar"); MK Automotive, LLC; MK Technology, LLC; Michael Kenwood Consulting, LLC; MK International Advisory Services, LLC; MKG-Atlantic Investment, LLC; Michael Kenwood Nuclear Energy, LLC; MyTcart, LLC; TUOL, LLC; MK Capital Merger Sub, LLC; MK Special Opportunity Fund; MK Venezuela, Ltd. ("MK Venezuela"); Short Term Liquidity Fund, I, Ltd.

*Securities and Exchange Commission v. Illarramendi*, *Michael Kenwood Capital Management, LLC et al. C.A.*, No. 3:11-cv-00078 (JBA), (the "SEC Action")[2] by and through his undersigned counsel, alleges the following:

<u>SUMMARY OF CLAIMS</u>

1.     The facts supporting the gravamen of the claims set forth herein are not the subject of dispute, but rather have been admitted in the guilty plea of Defendant Francisco Illarramendi ("Illarramendi") and in Illarramendi's subsequent testimony before this Court.  *See Stipulation of Offense Conduct*; Criminal Information, *United States v. Illarramendi*, 3:11 Cr. 41 (SUR) (<u>Exhibit A</u>) (the "Guilty Plea" or "Information").   Illarramendi admitted to having operated the hedge funds he managed (the "Funds") in a Ponzi scheme in which he "used money provided by new investors to the HVP Funds to pay out returns he promised to old investors" (the "Fraudulent Scheme").  *Id.*  The Fraudulent Scheme resulted in a loss in excess of $300 million, as estimated by Illarramendi himself in testimony before this Court in May of 2011.  *See* Transcript of Evidentiary Hearing at 355-356, May 25, 2011 *Securities and Exchange Commission vs. Francisco Illarramendi*, *et. al.*, Case No. 11-cv-0078 (the "May Hearing").   In the process of operating the Fraudulent Scheme, Illarramendi transferred or withdrew more than $22 million (as depicted on <u>Exhibit B</u>, the "Transfers") entrusted to him by those that invested in the Funds.  Through this action, the Receiver seeks to recover the damages Illarramendi admits in the Guilty Plea and May Hearing to having caused, or, at a minimum, to reclaim the value of the Transfers that were fraudulently made to Illarramendi and the other Defendants.

2.     From 2004 through the Fall of 2010, Illarramendi and two other individuals together formed, owned, and operated HVP Partners, a registered investment adviser located in

---

[2] Unless otherwise explicitly defined herein, we adopt for purposes of this complaint (this "Complaint") the defined terms as set forth in the Amended Order Appointing Receiver dated June 22, 2011.

Stamford, Connecticut.  HVP Partners advised two hedge funds: the Highview Point Master Fund and two feeder funds: Highview Point Offshore, Ltd. and Highview Point LP. (collectively, the "HVP Funds").

3.      As described more fully below, Illarramendi's Fraudulent Scheme began as early as October 2005, when Illarramendi first concealed from the HVP Funds' investors and others the multimillion dollar loss he incurred in a bond transaction.  Illarramendi chose to fraudulently conceal this loss on the books of the HVP Funds, creating a "hole" between the reported assets and liabilities of the Funds.  Illarramendi caused a false entry to be placed on HVP Offshore's trade blotter to fabricate a non-existent investment in Ontime Overseas, Inc. (another affiliate of one or more Receivership Entities).  This fabrication made it appear that HVP Offshore actually received a profit from the transaction.  In reality, as a result of the trading loss and cover up, HVP Offshore actually sustained a loss of approximately $5.2 million–a loss Illarramendi would spend the next five years trying to conceal through execution of the Fraudulent Scheme.  From that point onward, the Funds were indisputably insolvent.

4.      Illarramendi's efforts to conceal the hole only expanded it.  In blatant disregard for his duties as a fiduciary both to the funds he managed and to his investors, Illarramendi not only used money provided by new investors to pay the returns he promised to earlier investors, but also (a) created fraudulent documents to mislead and deceive his investors, creditors and the SEC about the existence and amount of the Funds' assets; (b) made false representations to his investors and creditors (and those of the Funds) in an effort to obtain new investments from them and to prevent them from seeking to liquidate their investments; (c) commingled the investments in each individual hedge fund with investments in the other hedge funds and other third parties without regard to their structure, stated purpose, or investment limitations; and (d) engaged in

transactions that were not in the best interests of the Funds and agreed to pay kickbacks to certain persons connected with those transactions. As a result of these fraudulent activities, Illarramendi left a gap between the liabilities owed to the Funds' investors and assets actually possessed by the Funds estimated by Illarramendi (in testimony before this Court) to exceed $300 million.

5.     Illarramendi showed no due regard for corporate formalities while operating the Receivership Entities and the Funds (the "HVP Funds") advised by Highview Point Partners. Illarramendi routinely withdrew monies from these entities in exchange for no consideration and, at times, transferred those monies to his immediate family members closest business associates in the Fraudulent Scheme. Illarramendi's wife, Maria Josephina Gonzalez-Miranda ("Gonzalez-Miranda") directly benefitted from many of the Transfers alleged herein, including ownership of a luxury home. Illarramendi's sister, Adela M. Illarramendi ("Adela"), was a recipient of some of the Transfers.[3] These transfers necessitate a judgment in favor of the Receiver for the benefit of Receivership Entities.

6.     Illarramendi and the other Defendants did not provide reasonably equivalent value in exchange for the Transfers. The Defendants either performed no services for the Transfers they received, or performed only services that were in furtherance of the Fraudulent Scheme, which cannot be reasonably equivalent value as a matter of law and in fact were detrimental and harmed the Receivership Entities. Having entered the Guilty Plea, Illarramendi further cannot establish that he is a good-faith transferee.

7.     At all times relevant to this Complaint, Illarramendi operated the Receivership Entities in furtherance of the Fraudulent Scheme. The Transfers were made with actual intent to

---

[3] Illarramendi, Gonzalez-Miranda, and Adela are hereinafter referred to as the "Defendants."

hinder, delay, and defraud the Receivership Entities and their creditors.  Illarramendi owed the Receivership Entities a fiduciary duty to act in their best interest and in the best interest of the Funds that entrusted their money to him.  Illarramendi was, however, completely derelict in performing his duties and responsibilities.  This failure makes Illarramendi liable for the full amount of the damages resulting from the Fraudulent Scheme, which must be returned to the Receiver for ultimate distribution to those who have been defrauded.

8.     Through this lawsuit, the Receiver requests all other relief available under the Connecticut Uniform Fraudulent Transfer Act ("CUFTA"), the Connecticut Unfair Trade Practices Act ("CUTPA"), and common law to which the Receiver may be entitled.  Specifically, the Receiver seeks an order determining that: (a) the Transfers were fraudulent transfers under the CUFTA, the Connecticut common law, or, in the alternative, unjustly enriched the Defendants; (b) the Transfers are property of the estate administered by the Receiver (the "Receivership Estate" or the "Receivership") and are held pursuant to a constructive trust for the benefit of the Receivership Estate; and (c) the Defendants are liable to the Receivership for an amount equaling the amount of the Transfers added to the damages described herein.

## THE DEFENDANTS

9.     Illarramendi was the managing member and one-third owner of Highview Point Partners, LLC ("HVP Partners"), which he co-founded with Christopher Luth ("Luth") and Francisco "Frank" Lopez ("Lopez") in 2004.  Beginning in or about 2006 and 2007, Illarramendi was also the majority owner and control person of a group of affiliated entities (the "MK Entities") that would eventually become organized as Michael Kenwood Group, LLC (the "MK Group").  The MK Group was formed as a Stamford, Connecticut-based holding company for MK Consulting, MK Capital, and other MK Entities.  Illarramendi operated HVP Partners, the

funds managed by HVP Partners (the "Highview Funds"), and the MK Entities in tandem, using transfers between these groups to conceal the Fraudulent Scheme.  Illarramendi resides in a luxury home built with monies transferred from the Receivership Entities and located at 61 Parade Hill Lane, New Canaan, Connecticut 06840 (the "New Canaan Home").

10.      Like her husband, Gonzalez-Miranda resides 61 Parade Hill Lane, New Canaan, Connecticut 06840.  At all times relevant to this Complaint, she was married to Illarramendi, and benefitted from usage of the Transfers, which are believed to have been held in common with her husband.

11.      Upon information and belief, Adela resides in Belgium.  As stated *supra*, Adela is Illarramendi's sister and received some of the Transfers, as depicted in Exhibit B.  Adela served as President of a foundation funded by one of the MK Entities and received several Transfers from the MK Group that were fraudulently characterized as "consulting fees," when in reality the services performed by Adela in exchange for these Transfers were of little or no value and were made in furtherance of the Fraudulent Scheme.  Adela is believed to have lived in the United States from time to time, including during periods of the overall time interval during which the Transfers took place.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1367 in that this is an action brought by the Receiver appointed by this Court concerning property under this Court's exclusive jurisdiction. *See Securities and Exchange Commission v. Illarramendi, Michael Kenwood Capital Management, LLC et al. C.A.*, No. 3:11-cv-00078 (JBA), Amended Order Appointing Receiver (June 22, 2011) (Docket #279).

13.      This Court has personal jurisdiction over the Defendants pursuant 28 U.S.C.

§ 754 and 28 U.S.C. § 1692.  All of the Defendants either reside in Connecticut, intentionally did business in Connecticut by repeatedly transacting with the Receivership Entities, held bank accounts in the United States, or some combination of the three.

14.    The District of Connecticut is the appropriate venue for any claims brought by the Receiver pursuant to 28 U.S.C. § 754 as the acts and transfers alleged herein occurred in the District.  Moreover, the Defendant's primary residence is in this district.

## RECEIVER'S STANDING

15.    On January 14, 2011, the Securities and Exchange Commission ("SEC") commenced a civil enforcement action against Illarramendi, MK Capital, and various Relief Defendants (the "SEC Defendants").  The SEC's complaint alleges that Illarramendi and others misappropriated investor assets in violation of Section 206(1), (2) and (4) of the Investment Advisers Act of 1940 and Rule 206(4)-(8) thereunder. The SEC also sought equitable relief, including injunctions against future violations of the securities laws, disgorgement, prejudgment interest, and civil monetary penalties.

16.    Simultaneously with the filing of its complaint, the SEC sought emergency relief, including a preliminary injunction, in the form of an order freezing the assets of the SEC Defendants. The SEC also sought the appointment of a receiver over those assets.

17.    On February 3, 2011, the Court appointed Plaintiff John J. Carney, Esq. as Receiver over all assets "under the direct or indirect control" of Defendant MK Capital and Relief Defendants MKAM, MKE&I, and MKEI Solar, LP.  A motion to expand the scope and duties of the Receivership was filed on March 1, 2011, and the Amended Receiver Order was entered on March 1, 2011, expanding both the duties of the Receiver and the definition of the Receivership Estate to include the MK Special Opportunities Fund Ltd. ("SOF"), the Short Term

Liquidity Fund I, Ltd. ("STLF"), and the MK Venezuela Fund Ltd. ("MKV") (collectively the "MK Funds").  On June 22, 2011, the Court entered a second Amended Receiver Order, which, *inter alia*, expanded the scope of the Receivership Estate to include HVP Partners as a Receivership Entity.  By additional order of the Court, the Receivership was again expanded on July 5, 2011, to include MK Master Investments LP, MK Investments, Ltd. and MK Oil Ventures LLC ("MK Oil").  On January 4, 2012, the Court entered another modified Receiver Order to include additional reporting requirements.

18.     Pursuant to the Court's Amended Order Appointing Receiver of January 4, 2012 ("Amended Receiver Order"), the Receiver has the duty of, among other things, identifying and recovering property of the Receivership Entities to ensure the maximum distribution to the Receivership Entities' defrauded creditors and to maximize the pool of assets available for distribution.  To accomplish this goal, the Receiver must take control of all assets owned by or traceable to the Receivership Estate, including any funds that were stolen, misappropriated, or fraudulently transferred as alleged herein.  The Receiver is presently seeking to bring the HVP Funds into the Receivership.

19.     As alleged herein, Illarramendi freely commingled proceeds between and among the Receivership Entities such that at all relevant times at least one of the Receivership Entities was a creditor of another giving the Receiver standing to recover fraudulent transfers made from the Receivership Entities.

20.     The Receiver has standing to bring these claims pursuant to, among other things, CUFTA, CONN. GEN. STAT. § 55-552; CUTPA, CONN. GEN. STAT. § 42-110a, *et seq.*; and Connecticut common law.

21.     The Receiver has standing to bring claims that the Receivership Entities could

have brought on their own behalf.  The Receivership Entities, including the MK Funds, are creditors of one another.  Accordingly, the Receiver has standing to recover the fraudulent transfers made to the Defendants.  The Receiver also has standing to bring common law claims on behalf of the Receivership Entities based upon Illarramendi's status as in insider and as a result of Illarramendi's breaches of fiduciary duties owed both to his investors and to the Receivership Entities.

## THE FRAUDULENT SCHEME

22.     On or about March 7, 2011, the United States Attorney's Office for the District of Connecticut filed a criminal information against Illarramendi alleging that Illarramendi, with others, had engaged in a massive fraudulent scheme involving hundreds of millions of dollars of money supplied primarily by foreign institutional and individual investors.

23.     According to the Information, Illarramendi engaged in multiple acts in furtherance of his fraudulent scheme, including but not limited to: (1) making false statements to investors, creditors and employees of the Receivership Entities, the SEC and others to conceal and continue the scheme; (2) creating or causing fraudulent documents to be created; (3) engaging in multiple transactions either without documentation or with fraudulent documentation in an effort to conceal and continue the scheme; (4) transferring millions of dollars of assets across the Receivership Entities and other entities he controlled to make investments in private equity companies; and (5) commingling assets across the Receivership Entities and other affiliated entities.  On March 7, 2011, Illarramendi pleaded guilty to two counts of wire fraud, and one count of conspiracy to obstruct justice, to obstruct an official proceeding, and to defraud the SEC.

24.     As Illarramendi publicly admitted during his plea allocution, he began engaging

in this scheme years earlier to hide from investors and creditors the losses he had incurred in a failed bond transaction that took place in 2005.  *See* Stipulation of Offense Conduct at 2; Criminal Information, *United States v. Illarramendi*; 3:11 Cr. 41 (SUR).  He also admitted to disregarding corporate formalities and commingling investments in various funds.  *Id*.  During late 2005 and 2006, Illarramendi added a new wrinkle to his efforts to conceal the hole which would be repeated later in different forms.  Rather than merely trying to hide the gap between the Funds' actual versus purposed assets and liabilities, Illarramendi unsuccessfully attempted to fill the hole by engaging in high-risk, unauthorized, and off-the-books trading in stocks of companies such as Google, Apple, Yahoo and other companies.  For the most part, these trades were financially disastrous and caused the "hole" to grow exponentially larger.  Throughout this and later stages of the Fraudulent Scheme, Illarramendi and HVP Partners continued to execute fraudulent transactions designed to hide the ongoing losses with commingled funds newly obtained from various third parties.  By August 2006, the hole had grown to at least $33 million, comprising more than one-third of the assets at the HVP Funds.  The insolvency of the HVP Funds continued to dramatically deepen.

25.     During late 2006 through 2007, in addition to continuing to execute fraudulent transactions to hide the hole, Illarramendi and HVP Partners used money from HVP Funds to execute high risk Venezuelan currency arbitrage transactions.  This stage of the Fraudulent Scheme was characterized by increasingly desperate loans and kickbacks, including the diversion and misappropriation of investor funds to South and Central American entities and individuals.  Some of these diverted funds appear to have been used to bribe at least one official of PDVSA's pension fund.

26.     As losses and costs of concealment at the HVP Funds became unmanageable and

more difficult to hide, Illarramendi began in 2007 to expand the Fraudulent Scheme by organizing the MK Entities and MK Funds to raise funds that would in large part be fraudulently transferred to, and commingled with, those of the HVP Funds.  Using the MK Funds to raise capital to conceal if not plug the hole had obvious advantages for Illarramendi, because none of the MK Funds registered with the SEC.  Moreover, neither MKV nor STLF was subject to audit, and neither had internal controls that interfered with Illarramendi's misuse or misappropriation of money or other property to conceal and fill the hole at the HVP Funds.  Illarramendi exploited these advantages to loot and misappropriate investor monies from the MK Funds to conceal and fill the hole at the HVP Funds and to thereby extend the Fraudulent Scheme.

27.     The creation of the MK Funds created new opportunities for the principals of HVP Partners and the principals of the MK Group to siphon investor funds for their and their associates' personal use.  For example, on or about June 16, 2009, MKV transferred $4 million to an entity called Fidevalores which was controlled by Illarramendi's brother-in-law.  Two days later, in an outrageous example of the looting of hedge funds, Fidevalores transferred $1.1 million to an account in the name of Luth, $500,000 to an account in the name of Illarramendi and Gonzalez-Miranda, and another $500,000 to OGH Advisors, an entity controlled by MK principal Odo Habeck.

28.     Similarly, in March of 2010, MKV transferred approximately $4 million to Underhill Investments, an entity that, upon information and belief, was controlled by Lopez's sister, Carolina Lopez.  In fact, over $3.97 million was diverted to Illarramendi and other Highview principals through Carolina Lopez's Underhill Investments.  During this period, the web of commingled transactions became even more complicated and convoluted, and the taint of commingled funds permeated throughout the HVP Funds.  Eventually, Illarramendi caused the

fraudulent transfer and commingling of more than one quarter of a billion dollars from the MK Funds and Entities to or for the HVP Funds.  As a result of the SEC's examination of the HVP Funds, which lead directly to the investigation of the MK Funds, the filing of the enforcement action, and this Court's asset freeze order, the entire Fraudulent Scheme finally collapsed.

29.     All three of the Defendants are "insiders" as that term is used in § 52-552 of the CUFTA.

### THE FRAUDULENT SCHEME WAS A WINDFALL FOR THE DEFENDANTS

30.     From 2005 to January 2011, the Defendants collectively received Transfers totaling at least $22,834,410, directly or indirectly, from Receivership Entities.  These include non-ordinary course payments, including some payments mischaracterized as a "bonus," as well as salary for jobs Illarramendi failed to perform appropriately.  Many of the non-ordinary course payments to the Defendants resulted from complex transactions orchestrated by Illarramendi to allow him to continue his fraud and line his own pockets.  Immediately below is a snapshot of certain funds transferred to the Defendants.

31.     Illarramendi (and, by extension, Gonzalez-Miranda) received at least $22,440,070 directly or indirectly, from Receivership Entities including, but not limited to, the following:

      a.   $1,673,594 in "bonus" payments;

      b.   $1,042,027 in "partnership distributions";

      c.   $808,000 in "salary" payments;

      d.   $15,641,449 in other, non-ordinary course payments; and

      e.   $3,275,000 in payments to Karp Builders (contractors for construction of the New Canaan Home) for the benefit of Illarramendi and Gonzalez-Miranda.

32.     A complete listing of the Transfers to each Defendant is set out on Exhibit B attached hereto and is fully incorporated herein by reference.

33.     Despite being only tangentially involved (at most) in any of the Receivership Entities' businesses, Adela directly received Transfers totaling at least $394,340 in the form of "Consulting Fees," "Retainer Fees," and/or "Salary Advances" that were made for less than reasonably equivalent value and with actual intent to defraud creditors of the Receivership Entities by furthering the Fraudulent Scheme.  Upon information and belief, Adela's role in the MK Group was normally limited to perusing various periodicals, forming acquaintances with individuals in Europe that provided little or no value to the Receivership Entities, and serving nominally as "President" of a foundation (the "MK Foundation") that was funded by monies transferred from the Receivership Estate for little or no consideration.  The Receivership Entities had no legal or contractual obligation to pay Adela the Transfers she received (oftentimes with monies transferred through several different Receivership Entities or third parties before reaching her).

34.     These Transfers were all paid from HVP Partners and other Receivership Entities to accounts controlled by Defendants.

35.     The Transfers were paid to Defendants or for the benefit of Defendants.

36.     While some individual transactions engaged in by HVP Partners might have yielded a profit, upon information and belief, HVP Partners, the Funds they oversaw and related Receivership Entities, were operated as a Fraudulent Scheme and were therefore insolvent at all relevant times.

37.     Illarramendi also did not earn his salary in his capacity as a member, manager, officer and/or director of HVP Partners or any of the other Receivership Entities.

38.     As a result, Illarramendi breached his fiduciary duties owed to HVP Partners by operating HVP Partners and the other Funds as a Fraudulent Scheme, and must disgorge the

compensation received.

39.     The Defendants were unjustly enriched by the Transfers as they did not provide equivalent value in exchange for the Transfers.

40.     The Receiver was only able to discover the fraudulent nature of the above-referenced Transfers after Illarramendi and his accomplices were removed from control of the Receivership Entities and after a time-consuming and extensive review of thousands upon thousands of paper and electronic documents relating to the Receivership Entities.  No amount of reasonable diligence by the Receiver could have detected the fraudulent transfers sooner.  The Receiver's investigation is still ongoing.  As a result, there may be evidence of other assets belonging to the Receivership Estate or other fraudulent transfers of funds that the Receiver has yet to discover.  If such transfers or assets are later discovered, the Receiver will seek to amend this Complaint to assert claims regarding such transfers or assets.

41.     To the extent that any of the recovery counts that follow may be inconsistent with each other, they are to be treated as being pleaded in the alternative.

**FIRST CAUSE OF ACTION**
**CUFTA SECTION 52-552e(a)(1) (ACTUAL FRAUD)**
*As To All Defendants*

42.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

43.     The Transfers were (a) made on or within four years before the date of this action or (b) were discovered within one year of discovery of the fraud by the Receiver.

44.     At the time of each of the Transfers, one or more of the Receivership Entities were each "creditors" within the meaning of section 52-552(b)(4) of CUFTA.

45.     At the time of each of the Transfers, Illarramendi and the other Defendants were

"insiders" of the Receivership Entities within the meaning of section 52-552(b)(7) of CUFTA.

46.      Each of the Transfers constitutes a transfer of an interest of Receivership Entity property within the meaning of section 52-552(b)(12) of CUFTA.  All of the Transfers occurred during the course of a Ponzi scheme, when investor money was commingled and all relevant entities and Funds were insolvent.   Accordingly, multiple Receivership Entities are creditors within the meaning of section 520552(b)(4) of CUFTA for the various Transfers alleged herein.

47.      Each of the Transfers was to, or for the benefit of, the Defendants.

48.      Each of the Transfers was made with money misappropriated from one or more of the Receivership Entities.  At all relevant times herein, the Receivership Entities had a claim to the funds used for the Transfers.

49.      Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants.

50.      Each of the Transfers were made by Illarramendi and others to further the Fraudulent Scheme and were made with the actual intent to hinder, delay and defraud some or all of the Receivership Entities' then-existing creditors.

51.      The Transfers constitute fraudulent transfers avoidable by the Receiver pursuant to section 52-552e(a)(1) of CUFTA and recoverable from the Defendants pursuant to section 52-552h of CUFTA.

52.      As a result of the foregoing, pursuant to sections 52-552e(a)(1) and 52-552h of CUFTA, the Receiver is entitled to a judgment (i) avoiding and preserving the Transfers; and (ii) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

## SECOND CAUSE OF ACTION
## CUFTA SECTION 52-522e(a)(2) (CONSTRUCTIVE FRAUD)
### *As To All Defendants*

53.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

54.     The Receiver seeks to avoid those Transfers that were made on or within four years before the date of this action.

55.     Each of the Transfers constitutes a transfer of an interest of property of the Receivership Entities within the meaning of section 52-552(b)(12) of CUFTA.  All of the Transfers occurred during the course of a Ponzi scheme, when all investor money was hopelessly commingled and all relevant entities were insolvent.  Accordingly, multiple Receivership Entities are creditors within the meaning of section 52-552(b)(4) of CUFTA for the various Transfers alleged herein.

56.     Each of the Transfers was to, or for the benefit of, the Defendants.

57.     Each of the Transfers was made with money misappropriated from Receivership Entities.  At all relevant times herein, HVP Partners or a related Receivership Entity had a claim to the funds used for the Transfers.

58.     Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants.

59.     At the time of each of the Transfers, the Receivership Entities were insolvent, were engaged in a business or transaction, or were about to engage in a business or a transaction, for which any property remaining with the Receivership Entities was an unreasonably small capital.

60.     At the time of each of the Transfers, the Receivership Entities intended to incur,

or believed that they would incur, debts that would be beyond its ability to pay as such debts matured.

61.    The Transfers were not made by the Receivership Entities in the ordinary course of business.

62.    The Transfers constitute fraudulent transfers avoidable by the Receiver pursuant to section 52-552e(a)(2) of CUFTA and recoverable from the Defendants pursuant to section 52-552h of CUFTA.

63.    As a result of the foregoing, pursuant to sections 52-552e(a)(2) and 52-552h of CUFTA, the Receiver is entitled to a judgment (i) avoiding and preserving the Transfers made on or before four years from the date of this action; and (ii) recovering the Transfers made on or before four years from the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

## THIRD CAUSE OF ACTION
## CUFTA SECTION 52-522f(a) (CONSTRUCTIVE FRAUD)
### *As to All Defendants*

64.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

65.    The Receiver seeks to avoid those Transfers that were made on or within four years before the date of this action.

66.    Each of the Transfers constitutes a transfer of an interest of property of the Receivership Entities within the meaning of section 52-552b(12) of CUFTA.  All of the Transfers occurred during the course of a Ponzi scheme, when investor money was commingled and all Receivership Entities were insolvent.  Accordingly, multiple Receivership Entities are creditors within the meaning of section 52-552(b)(4) of CUFTA for the various Transfers alleged

herein.

67.     Each of the Transfers was to, or for the benefit of, the Defendants.

68.     Each of the Transfers was made with money misappropriated from Receivership Entities.  At all relevant times herein, the Receivership Entities had a claim to the funds used for the Transfers.

69.     Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants.

70.     At the time of each of the Transfers, the Receivership Entities were insolvent, or became insolvent, as a result of the transfer in question.

71.     The Transfers constitute fraudulent transfers avoidable by the Receiver pursuant to section 52-552f(a) of CUFTA and recoverable from the Defendants pursuant to section 52-552h of CUFTA.

72.     As a result of the foregoing, pursuant to sections 52-552f(a) and 52-552h of CUFTA, the Receiver is entitled to a judgment (i) avoiding and preserving the Transfers made on or within four years from the date of this action; and (ii) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

**FOURTH CAUSE OF ACTION**
**COMMON LAW FRAUDULENT TRANSFER**
*As To All Defendants*

73.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

74.     The Receiver seeks to recover those Transfers that occurred on or within three years before the date of this action.

75.     At the time of each of the Transfers, one or more of the Receivership Entities

were creditors.

76.     Each of the Transfers constitutes a transfer of an interest of property of Receivership Entities.  The Transfers occurred during the course of a Ponzi scheme, when all investor money was commingled and the Receivership Entities were insolvent.  Accordingly, multiple Receivership Entities are creditors for the various Transfers alleged herein.

77.     Each of the Transfers was to, or for the benefit of, the Defendants.

78.     Each of the Transfers was made with money misappropriated from Receivership Entities.  At all relevant times herein, the Receivership Entities had a claim to funds used for the Transfers.

79.     Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants.

80.     At the time of each of the Transfers, the Receivership Entities were insolvent, or became insolvent, as a result of the transfer in question.

81.     The Transfers constitute fraudulent transfers avoidable by the Receiver and recoverable from the Defendants.

82.     As a result of the foregoing, the Receiver is entitled to a judgment (i) avoiding and preserving the Transfers made on or before three years from the date of this action; and (ii) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

## FIFTH CAUSE OF ACTION
## CUTPA, CONN. GEN. STAT. SECTION 42-110a, et seq.
*As To Defendant Illarramendi*

83.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

84.     The claim for breach of the CUTPA is asserted against Illarramendi, who, as detailed above, engaged in numerous and repetitive unfair or deceptive acts and practices in his various management capacities for the Receivership Entities.

85.     These unfair or deceptive acts were committed while Illarramendi was engaged in the conduct of an investment manager.

86.     As a result of Illarramendi's deceptive acts, the Receivership Entities, and the MK Funds in particular, suffered a loss.

87.     By reason of the above, the Receiver is entitled to an award of compensatory damages for Illarramendi's deceptive acts and practices in an amount to be determined at trial, but no less than the amount of losses admitted by Illarramendi to have been inflicted upon the Funds (estimated to exceed $300 million).

88.     Because of the repetitive nature of Illarramendi's deceptive acts, the Receiver is entitled to an award of punitive damages in an amount to be determined at trial.

89.     As required by CUTPA § 42-110(d), a copy of this Complaint is being sent to the Connecticut Attorney General and the Connecticut Commissioner of Consumer Protection.

**SIXTH CAUSE OF ACTION**
**<u>BREACH OF FIDUCIARY DUTY</u>**
*As To Defendant Illarramendi*

90.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

91.     The claim for breach of fiduciary duty is asserted against Illarramendi, who had a relationship of trust and confidence with the Receivership Entities, holding managerial and supervisory positions for HVP Partners and in the MK Entities during the relevant time period, and consequently had fiduciary duties to act in the best interests of, and for the benefit of, the

HVP Partners and the MK Entities.

92.     The fiduciary duties owed by Illarramendi included duties of care and loyalty to HVP Partners and the MK Entities and duties to act in good faith.  Illarramendi also had the duty not to waste or divert the assets of the Receivership Entities, duties not to act in furtherance of his own personal interests at the expense of HVP Partners and the MK Entities.

93.     Illarramendi breached the fiduciary duties owed to HVP Partners and the Receivership Entities by, among other things, the misuse of corporate assets, self-dealing, mismanagement, corporate waste, failure to heed red flags, and breach of his duty to act with care, loyalty, and good faith and fair dealing as alleged herein.

94.     Illarramendi's breach of his fiduciary duties has been a continual course of conduct and continued until he was removed from his management positions.

95.     As a direct and proximate result of Illarramendi's conduct, HVP Partners and related Receivership Entities were damaged.

96.     By reason of the above, the Receiver is entitled to an award of damages and disgorgement of all sums received by Illarramendi from HVP Partners and other Receivership Entities in an amount to be determined at trial, but no less than the amount of losses admitted by Illarramendi to have been inflicted upon the Funds (estimated to exceed $300 million).

**SEVENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
*As To All Defendants*

97.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

98.     The Defendants each benefited from the receipt of money from the Receivership Entities in the form of loans, payments, bonuses, compensation, and other Transfers alleged

herein which were the property of the relevant Receivership Entity and their investors, and for which the Defendants did not adequately compensate the relevant Receivership Entity or provide value.

99.     The Defendants unjustly failed to repay HVP Partners or related Receivership Entities for the benefits they received from the Transfers.

100.     The enrichment was at the expense of the Receivership Entities and, ultimately, at the expense of the MK Funds' creditors.

101.     Equity and good conscience require full restitution of the monies received by Defendants from the Receivership Entities for distribution to the creditors.

102.     Illarramendi's conscious, intentional, and willful tortious conduct alleged herein entitles the Receiver to recapture profits derived by the Defendants utilizing monies they received from Receivership Entities.

103.     By reason of the above, the Receiver, on behalf of the Receivership Entities and its creditors, is entitled to an award of compensatory damages in an amount to be determined at trial, but no less than the amount of losses admitted by Illarramendi to have been inflicted upon the Funds (estimated to exceed $300 million).

**EIGHTH CAUSE OF ACTION**
**CONSTRUCTIVE TRUST**
*As To All Defendants*

104.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

105.     As alleged herein, the assets of the Receivership Entities have been wrongfully diverted as a result of fraudulent transfers, unfair trade practices, unjust enrichment, conversion, breaches of fiduciary duty, and other wrongdoing of Illarramendi for his and the other

Defendants' own individual interests and enrichment.

106.    The Receiver has no adequate remedy at law.

107.    Because of the past unjust enrichment and fraudulent transfers made to the Defendants, the Receiver is entitled to the imposition of a constructive trust with respect to any transfer of funds, assets, or property from Receivership Entities, as well as to any profits received by the Defendants in the past or on a going forward basis from transfers derived from the Receivership Entities.

108.    In addition, the sums sent to or for the benefit of the Defendants, and received as fraudulent transfers and/or which were transferred directly for the purchase, construction, or improvement of real property as alleged herein (such as the Transfers to Karp Builders as denoted in Exhibit B), should be held in trust for the Receiver's use, benefit, and account, specifically the New Canaan Home.

109.    The Receiver is entitled to and demands title, possession, use and/or enjoyment of the foregoing property for the benefit of the Receivership Estate.

## NINTH CAUSE OF ACTION
## ACCOUNTING
*As To All Defendants*

110.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

111.    As set forth above, the assets of the Receivership Entities have been wrongfully diverted as a result of fraudulent transfers, breaches of fiduciary duties, conversion, and other wrongdoing of Illarramendi for the individual interests and enrichment of Illarramendi and his family (specifically, the remaining Defendants).

112.    The Receiver has no adequate remedy at law.

113.     To compensate the Receivership Entities for the amount of monies the Defendants diverted from Receivership Entities for their own benefit, it is necessary for the Defendants to provide an accounting of any transfer of funds, assets, or property received from the Receivership Entities, as well as to any profits in the past and on a going forward basis in connection with the Receivership Entities.  Complete information regarding the amount of such Transfers misused by the Defendants for their own benefit is within the Defendants' possession, custody, and control.

**TENTH CAUSE OF ACTION**
**CONVERSION**
*As To All Defendants*

114.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

115.     The Receivership Entities had a possessory right and interest to their assets.

116.     The Defendants converted the assets of Receivership Entities when they received monies originating from Receivership Entities other than the entity from which the Transfers were purportedly conveyed.  These actions deprived the Receivership Entities of the use of this money.

117.     As a direct and proximate result of this conduct, the Receivership Entities have not had the use of the money converted by the Defendants.

118.     By reason of the above, the Receiver, on behalf of the Receivership Entities, is entitled to an award of compensatory damages from all Defendants in an amount to be determined at trial, but not less than the value of the Transfers.

119.    Illarramendi's conscious, willful, wanton, and malicious conduct entitles the Receiver, on behalf of the Receivership Entities and their creditors, to an award of punitive damages from Illarramendi in an amount to be determined at trial.

**WHEREFORE**, the Receiver respectfully requests that this Court enter judgment in favor of the Receiver and against Defendants as follows:

i.      On the First Cause of Action; pursuant to sections 52-552e(a)(1) and 52-552h of the Connecticut Fraudulent Transfers Act: (i) avoiding and preserving the Transfers; and (ii) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

ii.     On the Second Cause of Action; pursuant to sections 52-552e(a)(2) and 52-552h of the Connecticut Fraudulent Transfers Act: (i) avoiding and preserving the Transfers made on or before four years from the date of this action; and (ii) recovering the Transfers made on or before four years from the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

iii.    On the Third Cause of Action; pursuant to sections 52-552f(a) and 52-552h of the Connecticut Fraudulent Transfers Act: (i) avoiding and preserving the Transfers made on or before four years from the date of this action; and (ii) recovering the Transfers made on or before four years from the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

iv.     On the Fourth Cause of Action; pursuant to Connecticut common law, (i) avoiding and preserving the Transfers made on or before three years from the date of this action; and (ii) recovering the Transfers made on or before three years from the date of this action, or the

value thereof, from the Defendants for the benefit of the Receivership Estate.

      v.    On the Fifth Cause of Action against Illarramendi, pursuant to sections 42-110(b) and (g) of the Connecticut Unfair Trade Practices Act, for compensatory and punitive damages in an amount to be determined at trial;

      vi.    On the Sixth Cause of Action against Illarramendi for breaches of fiduciary duty, for damages, disgorgement of all sums received by Illarramendi, or by any other Defendant for the benefit of Illarramendi, from the Receivership Entities for the period in which Illarramendi was in breach of his fiduciary duties;

      vii.    On the Seventh Cause of Action against each of the Defendants for unjust enrichment, for compensatory damages in an amount to be determined at trial;

      viii.    On the Eighth Cause of Action against each of the Defendants for imposition of a constructive trust upon any transfers of funds, assets, or property of the Receivership Entities, including, without limitation, against the New Canaan Home or any other real property purchased with monies originating from the Receivership Entities;

      ix.    On the Ninth Cause of Action against each of the Defendants for an accounting of any transfer of funds, assets, or property of the Receivership Entities.

      x.    On the Tenth Cause of Action against the Defendants for conversion, for damages in an amount to be determined at trial.

      xi.    On all Causes of Action, awarding the Receiver all applicable pre-judgment and post-judgment interest, costs, and disbursements of this action; and

      xii.    On all Causes of Action, granting the Receiver such other, further, and different relief as the Court deems just, proper and equitable.

The Receiver respectfully requests a jury trial for all of the preceding causes of action.

Date:  February 2, 2012          /s/ *Ona T. Wang*

                                 BAKER & HOSTETLER LLP
Of Counsel:                      45 Rockefeller Plaza, 11th Floor
                                 New York, NY 10111
James W. Day                     Ona T. Wang
jday@bakerlaw.com'               owang@bakerlaw.com
                                 Jonathan R. Barr
Amy Vanderwal                    jbarr@bakerlaw.com
avanderwal@bakerlaw.com          Marc E. Hirschfield
                                 mhirschfield@bakerlaw.com
                                 Tel: (212) 589-4200
                                 Fax: (212) 589-4201

                                 *Attorneys for Receiver John J. Carney*