**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JOHN J. CARNEY, in his capacity as court-appointed receiver, Plaintiff, | No. 3:12-cv-00165 (SRU) |
| v. | |
| FRANCISCO ILLARRAMENDI, Defendant. | |

## RULING ON MOTION FOR SUMMARY JUDGMENT

John J. Carney, in his capacity as court-appointed receiver for the Michael Kenwood Group and certain affiliated entities (collectively, the "Receivership Entities"),[1] filed an eleven-count complaint against Francisco Illarramendi in an effort to recover assets stolen in the course of Illarramendi's Ponzi scheme.[2] The receiver now has moved for summary judgment on five counts of the Amended Complaint. For the following reasons, I grant the receiver's motion with respect to Counts Six, Seven, and Eleven of the Amended Complaint, as well as with respect to either Count One or Count Ten, but not both. I allow the receiver ten days to file a notice on the docket stating whether he intends to pursue Count One or Count Ten of the Amended Complaint. The Clerk shall then enter judgment for the receiver on the appropriate counts.

---

[1] The Receivership Entities include Highview Point Partners, LLC, Michael Kenwood Group, LLC, MK Master Investments LP, MK Investments, Ltd., MK Oil Ventures LLC, Michael Kenwood Capital Management, LLC; Michael Kenwood Asset Management, LLC; MK Energy & Infrastructure, LLC; MKEI Solar, LP; MK Automotive, LLC; MK Technology, LLC; Michael Kenwood Consulting, LLC; MK International Advisory Services, LLC; MKG-Atlantic Investment, LLC; Michael Kenwood Nuclear Energy, LLC; Mytcart, LLC; Tuol, LLC; MK Capital Merger Sub, LLC; MK Special Opportunity Fund; MK Venezuela, Ltd.; Short Term Liquidity Fund I, Ltd. Am. Compl., Doc. No. 51, at 1.

[2] The receiver also initially named Illarramendi's wife, Maria Josephina Gonzalez-Miranda, and Illarramendi's sister, Adela M. Illarramendi, as defendants. *See* Am. Compl., Doc. No. 51, at 1. He later reached a settlement with the other two defendants. *See* Docs. Nos. 61 & 91.

# I.      Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a summary judgment motion, the court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000); *Aldrich v. Randolph Ctrl. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). "The burden of showing that no genuine factual dispute exists rests upon the moving party." *Carlton v. Mystic Transp.*, 202 F.3d 129, 133 (2d Cir. 2000). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient evidence supporting its position "to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"The trial court's function at this stage is to identify issues to be tried, not decide them," *Graham v. Long Island R.R. Co.*, 230 F.3d 34, 38 (2d Cir. 2000), and so "[o]nly when no reasonable trier of fact could find in favor of the non-moving party should summary judgment be granted." *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000). Summary judgment therefore is improper "[w]hen reasonable persons, applying the proper legal standards, could differ . . . on the basis of the evidence presented." *Sologub*, 202 F.3d at 178. Nevertheless,

> the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

*Anderson*, 477 U.S. at 247–48.

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and in such circumstances, there is "no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim). To present a "genuine" issue of material fact and avoid summary judgment, the record must contain contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

## II.     Background

Francisco Illarramendi worked as an investment adviser to certain hedge funds. Between approximately 2006 and February 8, 2011, Illarramendi defrauded investors by operating a large-scale Ponzi scheme. Plea Agreement, Ex. E to Fokas Decl., Doc. No. 98-5, at 13; s*ee United States v. Illarramendi*, 2015 WL 8664174, at *2 (D. Conn. Dec. 11, 2015), *aff'd*, 677 F. App'x 30 (2d Cir. 2017) (summary order). Essentially, Illarramendi solicited new investments in the funds to pay earlier promised returns, all while concealing—through use of fraudulent documents and false representations—that the funds' liabilities greatly exceeded the true value of their assets. Plea Agreement, Doc. No. 98-5, at 13. Illarramendi also lied to SEC investigators in an attempt to conceal his misconduct. *Id.* at 13–14.

On January 14, 2011, the SEC initiated a civil action against Illarramendi and various businesses he controlled (the Receivership Entities) for violations of sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6(1), (2), & (4); violation of the SEC's Rule 206(4)-8, 17 C.F.R. 275.206(4)-8; and unjust enrichment. Compl., Doc. No. 1, *SEC*

*v. Illarramendi*, 3:11-cv-00078 (JBA). The SEC simultaneously filed a motion for a temporary restraining order freezing Illarramendi's assets. Doc. No. 2, *id.* After a hearing, United States District Judge Janet B. Arterton issued an order freezing assets and appointed John J. Carney as receiver for the Receivership Entities on February 3, 2011. *See* Docs. Nos. 36, 66, & 67, *id.*

On March 7, 2011, Illarramendi was charged in a five-count criminal information with wire fraud in violation of 18 U.S.C. § 1343 (Counts One and Two); securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 240.10b-5 (Count Three); investment adviser fraud in violation of 15 U.S.C. §§ 80b-6 & 80b-17 (Count Four); and conspiracy to obstruct justice in violation of 18 U.S.C. § 371 (Count Five). *See* Information, Ex. D to Fokas Decl., Doc. No. 98-4. Illarramendi pleaded guilty to all five counts on the same day.[3] Plea Agreement, Doc. No. 98-5. In an attached stipulation of offense conduct—signed by Illarramendi and his attorney—Illarramendi acknowledged that he "engaged in a scheme to defraud his investors, creditors and the [SEC] . . . by means of materially false and fraudulent pretenses, representations and promises." *Id.* at 13. Illarramendi stipulated that he:

> (a) used money provided by new investors to the Funds to pay out the returns he promised to earlier investors;
>
> (b) created fraudulent documents to mislead and deceive his investors, creditors and the SEC about the existence of the Funds' assets;
>
> (c) made false representations to his investors and creditors in an effort to obtain new investments from them and to prevent them from seeking to liquidate their investments;
>
> (d) commingled the investments in each individual hedge fund with investments in the other hedge funds without regard to their structure, stated purpose or investment limitations and thus, treated all investments in the Funds as a single source to provide returns to investors; and

---

[3] Illarramendi's plea agreement was not filed on the docket until May 5, 2011. *See* Doc. No. 10, *United States v. Illarramendi*, No. 3:11-cr-00041 (SRU).

(e) engaged in transactions that were not in the best interests of the Funds and agreed to pay kickbacks to persons connected with those transactions.

*Id.* As a result of Illarramendi's misconduct, the hedge funds he managed and advised "ha[d] outstanding liabilities that greatly exceed[ed] the true value of their assets, exposing the investors and creditors to the risk of suffering losses of hundreds of millions of dollars." *Id.*

On May 10, 2011, the SEC filed a Second Amended Complaint and a second motion for a temporary restraining order. Judge Arterton held a five-hour hearing on the SEC's motion on May 25, 2011.[4] Illarramendi testified at length during that hearing and admitted that, after incurring a $30 million trading loss in late 2005, he decided to "conceal the loss . . . and try to 'raise as much money as possible to be able to make it so that the gains from . . . the additional money would eventually cover the loss.'"[5] *SEC v. Illarramendi*, 260 F. Supp. 3d 166, 172 (D. Conn. 2017) (quoting May 25, 2011 TRO Hr'g Tr., Doc. No. 260, at 364 (hereinafter "TRO Hr'g Tr.")). He stated that he "tried to solve the problem" by running "a unified treasury function," through which "the money, no matter where it came from, was used either to invest in transactions or to pay . . . investors that were lending to the pot." *Id.* (quoting TRO Hr'g Tr., Doc. No. 260, at 365). Illarramendi's "comingling account" was used "for paying off other investors that the pot owed money to." *Id.* (quoting TRO Hr'g Tr., Doc. No. 260, at 398). In other words, "earlier investors [were] paid from the investments of more recent investors"—the hallmark of a Ponzi scheme. *Eberhard v. Marcu*, 530 F.3d 122, 132 n.7 (2d Cir. 2008).

---

[4] Judge Arterton subsequently granted the motion for a temporary restraining order by written ruling on June 16, 2011. *See SEC v. Illarramendi*, 2011 WL 2457734 (D. Conn. June 16, 2011).

[5] I take judicial notice of Illarramendi's testimony as part of an "official court record of [another] court in [my] jurisdiction in a case that is related to this one." *Jacques v. U.S. R.R. Ret. Bd.*, 736 F.2d 34, 40 (2d Cir. 1984). I note that Illarramendi's statements could be offered at trial to "prove the truth of the facts stated in them because they are admissions of an adverse party." *See United States v. Russo*, 302 F.3d 37, 43 (2d Cir. 2002) (citing Fed. R. Evid. 801(d)(2)(A)).

At the hearing, Illarramendi also "admitted that he received more in management fees than he was entitled to and that the management fees paid . . . were 'inflated.'" *Illarramendi*, 260 F. Supp. 3d at 173 (quoting TRO Hr'g Tr., Doc. No. 260, at 385). Illarramendi's fees "were calculated on the Net Asset Value ('NAV') of each of the funds" that he advised, and "the NAVs as calculated . . . included profits from transactions . . . [that] were fictitious." *Id.* (quoting TRO Hr'g Tr., Doc. No. 260, at 384). Illarramendi "modif[ied] the numbers" at the end of each year "so that [he] would receive more compensation than [he] w[as] really entitled to if you looked at it under strict terms." *Id.* (quoting TRO Hr'g Tr., Doc. No. 260, at 387–88).

On January 29, 2015, I sentenced Illarramendi to 156 months' imprisonment, three years' supervised release, and a $500 special assessment. Because I determined that the true loss could "not be calculated with sufficient [specificity], clarity, and confidence," I used the estimated amount of Illarramendi's gain—approximately $20 million—in calculating his advisory range under the Sentencing Guidelines. Sentencing Hr'g Tr., Ex. J to Fokas Decl., Doc. No. 98-10, at 72–73. I later held a separate hearing on restitution after supplemental briefing from both parties. On December 11, 2015, I issued a written ruling that ordered Illarramendi to pay restitution in the amount of $370,482,716.54, based on the "fair and reasonable" estimate of losses provided by the receiver. *Illarramendi*, 2015 WL 8664174, at *3.

During the pendency of the criminal and SEC actions, a number of civil cases have proceeded concomitantly as the receiver has attempted to recover stolen assets for the benefit of the Receivership Entities and the investors. *See, e.g.*, *Carney v. Beracha*, No. 3:12-cv-00180 (SRU); *Carney v. Marin*, No. 3:12-cv-00181 (SRU); *Carney v. Lopez*, No. 3:12-cv-00182 (SRU); *Carney v. Montes*, No. 3:12-cv-00183 (SRU); *Carney v. Horizon Invs.*, No. 3:13-cv-00660 (SRU). In the present case, the receiver seeks to recover money stolen by Illarramendi

himself. The Amended Complaint alleges actual fraud in violation of Conn. Gen. Stat. § 52-552e(a)(1) (Count One); constructive fraud in violation of Conn. Gen. Stat. § 52-552e(a)(2) (Count Two) and Conn. Gen. Stat. § 52-552f(a) (Count Three); common law fraudulent transfer (Count Four); unfair trade practices in violation of Conn. Gen. Stat. § 42-110a et seq. (Count Five); breach of fiduciary duty (Count Six); unjust enrichment (Count Seven); conversion (Count Ten); and the common law writ of indebitatus assumpsit (money had and received) (Count Eleven). *See* Doc. No. 51. The Amended Complaint also seeks the imposition of a constructive trust (Count Eight) and an equitable accounting (Count Nine).[6] The receiver requests relief in the form of damages, disgorgement, and avoidance of fraudulent transfers.

On June 20, 2017, the receiver moved for partial summary judgment on five counts of the Amended Complaint. Doc. No. 96. On October 10, 2017, Illarramendi opposed the motion. Doc. No. 113. The receiver filed a reply on October 27, 2017, Doc. No. 116, and Illarramendi filed a surreply on December 15, 2017. Doc. No. 117 I elected to rule on the papers without argument.

## III. Discussion

The receiver has moved for summary judgment on Counts One (Connecticut Uniform Fraudulent Transfer Act ("CUFTA")), Six (Breach of Fiduciary Duty), Seven (Unjust Enrichment), Ten (Conversion), and Eleven (Money Had and Received) of the Amended Complaint. The receiver argues that "the same essential facts [are] at issue in this case" as were

---

[6] The Amended Complaint characterizes constructive trust and accounting as causes of action, but they are better conceptualized as remedies. *See Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 623 n.3 (2002); *AW Power Holdings v. FirstLight Waterbury Holdings*, 2015 WL 897785, at *9 (Conn. Super. Ct. Feb. 17, 2015) ("[I]n *Macomber*, our Supreme Court stated that an accounting is a remedy."); *Romero v. Gewirtz*, 2011 WL 4953481, at *2–*3 (Conn. Super. Ct. Sept. 28, 2011) ("[A] constructive trust is properly pleaded as a remedy as opposed to a separate cause of action . . . .") (citing *Macomber*, 261 Conn. at 623 n.3).

"found . . . when adjudicating Illarramendi guilty in the Criminal Action." Mem. Supp. Mot. Summ. J., Doc. No. 99, at 12. Through the doctrine of collateral estoppel, the receiver contends, Illarramendi should be "prevent[ed] . . . from re-litigating issues already decided in the Criminal Action." *Id.* Because the facts "necessary to establish the criminal convictions . . . are also sufficient to impose civil liability on Illarramendi," the receiver requests that judgment be entered in his favor as a matter of law. *Id.*

Illarramendi's response is somewhat incoherent, but he appears to argue that collateral estoppel does not apply because he has a section 2255 petition for writ of habeas corpus presently pending before this court. *See* Mem. Opp'n Mot. Summ. J., Doc. No. 113, at 31. He also argues that he did not have a "full and fair opportunity" to litigate in the SEC and criminal actions because he was "rendered indigent at the beginning of the judicial process by an unconstitutional, court-ordered TRO," *id.* at 32; "[k]ey decisions . . . [were] ordered by the District Court after hearings at which the Pro Se defendant was not able to participate," *id.* at 33; and one of Illarramendi's investors—Venezuela's state-owned oil company, Petróleos de Venezuela, S.A. ("PDVSA")—was "allowed to present a fraudulent and overvalued claim" that was "approved by the Court at the behest of the Receiver without any evidentiary scrutiny." *Id.* In addition, Illarramendi asserts that his prior statements and affirmations are "unavailing" because "they were factually erroneous, . . . based on a layman's misunderstanding of the legal parameters," and "recanted . . . early in the process." *Id.* at 34. Finally, even if collateral estoppel does apply and Illarramendi is bound by his previous statements, Illarramendi argues that his affirmative defenses of extortion and duress "exonerate [him] from any guilt." *Id.* at 44.

A. Does collateral estoppel apply?

"Under the doctrine of offensive collateral estoppel (more recently called offensive issue preclusion), a plaintiff may foreclose a defendant from relitigating an issue the defendant has previously litigated but lost against another plaintiff." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 303–04 (2d Cir. 1999). "The Government bears a higher burden of proof in the criminal than in the civil context," and so either the United States or another party "may rely on the collateral estoppel effect of a criminal conviction in a subsequent civil case." *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 43 (2d Cir. 1986) (Newman, J.). "[F]ederal law governs the collateral estoppel effect of a federal criminal conviction in a subsequent diversity action." *Id.* In the present case, if collateral estoppel applies, then Illarramendi "is barred from relitigating any issue determined adversely to him in the criminal proceeding." *See id.*

Because the doctrine of collateral estoppel "elevates uniformity and repose above correctness," *id.* at 44, "courts have imposed a number of prerequisites to assure that the precluded issue, whether or not correctly resolved, was at least carefully considered in the first proceeding." *Monarch Funding Corp.*, 192 F.3d at 304. In order for collateral estoppel to apply:

> (1) the issues in both proceedings must be identical,
>
> (2) the issue in the prior proceeding must have been actually litigated and actually decided,
>
> (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and
>
> (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.

*Gelb*, 798 F.2d at 44. "The party asserting collateral estoppel"—here, the receiver—"bears the burden of demonstrating that it is entitled to th[at] relief." *Bear, Stearns & Co. v. 1109580 Ontario*, 409 F.3d 87, 93 (2d Cir. 2005).

Judge Arterton recently gave estoppel effect in the SEC action to Illarramendi's admissions in the criminal action.[7] *See Illarramendi*, 260 F. Supp. 3d at 176. As explained below, I agree with Judge Arterton's reasoning and also hold that collateral estoppel applies.

1. *Are the issues in both proceedings "identical"?*

The same underlying conduct—Illarramendi's operation of the Ponzi scheme—gave rise to the criminal action, the SEC action, and the present case. Although the causes of action differ, "[t]he allegations . . . described in the [receiver]'s complaint in this action parallel the events and charged determined . . . in [Illarramendi's] guilty plea[]." *See Mishkin v. Ageloff*, 299 F. Supp. 2d 249, 253 (S.D.N.Y. 2004). For example, the receiver's claim for breach of fiduciary duty requires him to show that "a fiduciary relationship existed." *Rendahl v. Peluso*, 173 Conn. App. 66, 100 (2017). That issue effectively is decided by Illarramendi's admission in the criminal action that he "acted as an investment adviser to certain hedge funds," Plea Agreement, Doc. No. 98-5, at 13, because investment advisers are considered fiduciaries under both Connecticut and federal law. *See SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 194 (1963) ("Congress recognized the investment adviser to be . . . a fiduciary . . . ."); *Iacurci v. Sax*, 313 Conn. 786, 804 (2014) ("[C]ourts have concluded that [a] relationship . . . is fiduciary in nature when a heightened risk of abuse of trust or confidence exists, such as when the [defendant] acts as an investment advisor . . . ."); *Lehn v. Dailey*, 2002 WL 449842, at *2–*3 (Conn. Super. Ct. Feb. 27, 2002) ("defendant . . . owed a duty to the plaintiffs as a fiduciary" because he "f[ell] within

---

[7] Judge Arterton also relied on Illarramendi's prior testimony before her, particularly at the May 25, 2011 hearing on the SEC's motion for temporary restraining order. *See SEC v. Illarramendi*, 260 F. Supp. 3d 166, 179 (D. Conn. 2017). Although Illarramendi's prior statements are not "adjudications" and are not themselves entitled to estoppel effect, I may take judicial notice of them as adverse party admissions contained in official court records. *See supra* note 5.

the definition of an investment adviser" under Conn. Gen. Stat. § 36b-3(10)). Thus, at least some of the issues are "identical" such that estoppel of those issues would be appropriate.

2. *Were the issues "actually litigated and actually decided" in the prior proceeding?*

"For a finding to merit estoppel effect it must . . . have been actually litigated and actually decided in the initial action." *Monarch Funding Corp.*, 192 F.3d at 309. "[T]he actual litigation and actual decision prerequisites help ensure that a finding was carefully considered in the first action, and that it therefore may serve as a fair basis for estoppel." *Id.* Thus, when an issue "received little attention from either the parties or the court" in the prior action, "applying collateral estoppel . . . would be improper." *Id.*

Here, it can hardly be said that the issues underlying the receiver's claims received "little attention" in the criminal case. *Id.* To the contrary, the issues not only were the subject of a binding stipulation to Illarramendi's plea agreement—which may of its own force render those issues "actually litigated" for purposes of collateral estoppel, *see Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa, S.A.*, 56 F.3d 359, 369 & n.4 (2d Cir. 1995)—but also many of them (e.g., the amount of loss) were hotly contested at Illarramendi's sentencing and restitution hearings. *See United States v. U.S. Currency in Amount of $119,984.00, More or Less*, 304 F.3d 165, 179 (2d Cir. 2002) ("That the issues . . . were raised by the [presentence report], addressed by one party, and made the subject of inquiry by the District Court strongly suggests that those issues were 'actually litigated' for purposes of collateral estoppel . . . ."). The multiple written decisions in Illarramendi's criminal case also show that the issues have been "actually" (indeed, exhaustively) "litigated." *See Illarramendi*, 2015 WL 8664174, at *3; *Illarramendi*, 677 F. App'x 30; *United States v. Illarramendi*, 642 F. App'x 64 (2d Cir. 2016) (summary order).

Therefore, I conclude that the issues that were "actually decided" in the previous actions—as reflected by the hearing transcripts and written opinions—were also "actually litigated."

3. *Was there a "full and fair opportunity for litigation" in the prior proceeding?*

Illarramendi concentrates his opposition on the third prerequisite for collateral estoppel, asserting that he lacked a "full and fair opportunity for litigation" in the criminal action. As he also has claimed in his habeas petition, Illarramendi argues that he was deprived of a "full and fair opportunity" to litigate because the asset freeze imposed by Judge Arterton "forced [him] into representation by counsel that [was] not of his choice" and was not "competent to deal with essential elements of the case." Mem. Opp'n Mot. Summ. J., Doc. No. 113, at 32.

Even assuming that Illarramendi's Sixth Amendment claim has merit, his "sworn admissions" embodied in the plea agreement are not vitiated merely due to dissatisfaction with his counsel. *See Illarramendi*, 260 F. Supp. 3d at 178. Illarramendi does not argue that he was deprived of any specific "opportunity to vigorously put forth a defense in the criminal action," *see In re Adelphia Commc'ns Corp.*, 2006 WL 2463355, at *4 (S.D.N.Y. Aug. 23, 2006), which "took place in accord with the procedural and constitutional safeguards accorded to criminal defendants in United States District Courts." *SEC v. Namer*, 2004 WL 2199471, at *5 (S.D.N.Y. Sept. 30, 2004), *aff'd*, 183 F. App'x 120 (2d Cir. 2006) (summary order). To the contrary, Illarramendi was afforded his right to counsel throughout the criminal proceedings. Even when he chose to represent himself, as he did at the restitution hearing, stand-by counsel was present. Illarramendi (or his attorney) cross-examined the government's witnesses, filed myriad briefs, and unsuccessfully appealed both his sentence and the restitution order. Notwithstanding Illarramendi's frustration with his conviction, I conclude that he had "a full and fair opportunity . . . to litigate the issues in the criminal proceedings." *See Mishkin*, 299 F. Supp. 2d at 253.

4. *Were the determinations with respect to the issues "necessary to support a valid and final judgment on the merits"?*

With respect to the final requirement—that "the issue previously litigated must have been necessary to support a valid and final judgment on the merits," *Gelb*, 798 F.2d at 44— Illarramendi suggests that his criminal conviction is not "final" because he has filed a habeas petition and is seeking en banc review from the Second Circuit. As Judge Arterton noted, however, "the pendency of a criminal appeal generally does not deprive a criminal judgment of its preclusive effect." *Illarramendi*, 260 F. Supp. 3d at 178; *see United States v. Int'l Bhd. of Teamsters*, 905 F.2d 610, 621 (2d Cir. 1990). Moreover, "the pendency of [ ] Illarramendi's habeas petition and en banc action do not undermine the preclusive effect of his sworn admissions" in the plea agreement and attached stipulation. *Id.* (emphasis omitted). Because Illarramendi's conviction and my restitution order were "sufficiently firm to be accorded conclusive effect," I conclude that they were "'final' in the sense of precluding further litigation of the same issue" for purposes of collateral estoppel. *In re Aggrenox Antitrust Litig.*, 2017 WL 5885664, at *8 (D. Conn. Nov. 29, 2017) (quoting *Lummus Co. v. Commonw. Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir. 1961); Restatement (Second) of Judgments § 13).

The earlier findings also were "'necessary' to th[e] decisions" in the criminal case. *See id.* For example, the stipulation of offense conduct was necessary to satisfy the elements of the crimes with which Illarramendi was charged; the calculation of Illarramendi's gain was necessary to determine his Sentencing Guidelines range; and the calculation of the investors' loss was necessary to support the restitution order. Accordingly, I conclude that the receiver has carried his burden to show that all of the elements of collateral estoppel are met.

5. *Would application of collateral otherwise be "unfair"?*

The Second Circuit has emphasized that the four "perquisites to preclusion" set forth in *Gelb* are "designed to ensure fairness." *Monarch Funding Corp.*, 192 F.3d at 309. Beyond the factors considered by *Gelb*, though, other "circumstances [may] so undermine confidence in the validity of an original determination as to render application of the doctrine impermissibly 'unfair.'" *Id.* at 304. For example, the second action may "afford[] 'procedural opportunities unavailable in the first action that could readily cause a different result.'" *Id.* (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330–31 (1979)). Or a party may have had "little incentive to litigate the relevant issue vigorously in the original action, particularly if the second action [was] not foreseeable." *Id.* Ultimately, the party seeking to apply collateral estoppel bears the burden to affirmatively "show that preclusion [is] fair." *Id.* at 306.

In particular, the Second Circuit has held that "precluding religitation on the basis of [sentencing] findings should be presumed improper," for several reasons. *Id.* First, "a plenary civil trial affords a defendant procedural opportunities"—such as "opportunities to take discovery"—"that are unavailable at sentencing that could command a different result."[8] *Id.* at 305. Second, a defendant often has a lower incentive to "challenge sensitive issues during sentencing," either out of a hope of leniency or due to a belief in the futility of fighting the trial judge's substantial discretion in sentencing matters. *See id.* Third, reliance on sentencing findings often will be inefficient. The parties, aware of sentencing's "procedural looseness," may be incentivized to "introduce gratuitous material" at sentencing in order to preclude litigation of certain issues in a subsequent civil suit. *Id.* at 305–06. And the judge in the subsequent action,

---

[8] Evidence admitted at a civil trial also is subject to evidentiary challenge, whereas a sentencing judge is "largely unlimited" with respect to "the kind of information [he] may consider." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 305 (2d Cir. 1999).

recognizing the "concerns of unfairness" that arise from giving sentencing findings estoppel effect, will need to take "a more cautious approach in the civil case . . . than would be otherwise necessary." *Id.* at 306. Thus, although the Second Circuit declined to "foreclose application of the doctrine in all sentencing cases," it cautioned that collateral estoppel "should be applied only in those circumstances where it is clearly fair and efficient to do so." *Id.*

I conclude that such circumstances are present here. As the receiver argues, Illarramendi already had ample opportunity to litigate the relevant issues in his criminal case. His sentencing hearing lasted four hours, Doc. No. 163, and his restitution hearing lasted nearly four-and-a-half. Doc. No. 180. Illarramendi or his attorney submitted briefs, filed affidavits, and cross-examined witnesses. There is no suggestion that I considered any "gratuitous material" at either hearing that would not be admissible in a civil case. *Cf. Monarch Funding Corp.*, 192 F.3d at 306. Nor does Illarramendi's "incentive to litigate [the] sentencing finding[s]" appear to have been "less intense," *see id.* at 305, in view of how vigorously he and his attorney disputed the government's calculations of Illarramendi's gain and his investors' loss. In short, I cannot see how applying the sentencing and restitution findings in this case would be "unfair" to Illarramendi. *Cf. id.*

Conversely, the efficiency gains from applying collateral estoppel are greater than usual. As noted, Illarramendi's sentencing and restitution hearings already consumed more than an entire business day of court time. Illarramendi also appealed his sentence and my restitution order to the Second Circuit, which affirmed both. *See* 677 F. App'x 30; 642 F. App'x 64. Considering that Illarramendi's objections to the receiver's motion for summary judgment are virtually identical to those raised against his sentence and the restitution order, I deem it extraordinarily inefficient to allow him another chance to relitigate those issues.

Therefore, because application of collateral estoppel is "clearly fair and efficient" here, I hold that Illarramendi is collaterally estopped from denying his admissions that:

(a) The statements set forth in the stipulation of offense conduct are true and accurate. Waiver & Plea Hr'g Tr., Ex. G to Fokas Decl., Doc. No. 98-7, at 38.

(b) He acted as an investment adviser to hedge funds. Plea Agreement, Doc. No. 98-5, at 13.

(c) He made materially false and misleading representations to investors in the hedge funds to conceal that he had lost money on certain investments. *Id.*

(d) He engaged in a scheme to defraud investors rather than disclosing the loss. *Id.*

(e) He used the mails or wire transmission to communicate in interstate or foreign commerce fraudulent documents including bogus debt instruments and a fictitious asset verification letter. *Id.*

(f) He made materially false and misleading statements to investors, creditors, and the SEC about the performance of the funds under his advisement. *Id.*

(g) He used money from new investors to pay out returns promised to old investors. *Id.*

(h) He created fraudulent documents to mislead investors. *Id.*

(i) He made false representations to investors in order to obtain new investments. *Id.*

(j) He commingled the monies in various funds under his advisement. *Id.*

(k) He engaged in transactions that were not in the best interests of the funds and agreed to pay kickback to persons connected to those transactions. *Id.*

*See also Illarramendi*, 260 F. Supp. 3d at 179. Furthermore, Illarramendi is estopped from contesting issues resolved against him during the sentencing and restitution proceedings. Thus, I hold that the amount of the investors' losses approximates $370,482,717, and the amount of Illarramendi's gain approximates $25,844,834. *See Illarramendi*, 2015 WL 8664174, at *3–*4.

B. Do the facts determined in the criminal action establish Illarramendi's liability as a matter of law?

"Summary judgment is appropriate under the doctrine of collateral estoppel . . . when all the material issues of fact in a pending action have been actually and necessarily resolved in a prior proceeding," *Mishkin*, 299 F. Supp. 2d at 252, such that the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, the material factual issues were all addressed by the prior litigation, and Illarramendi offers nothing in opposition to summary judgment but "conclusory, speculative and self-serving denials of his admissions . . . or unparticularized references to threats and extortion." *See Illarramendi*, 260 F. Supp. 3d at 170–71. For example, Illarramendi claims that he acted under duress because he was subject to threats and "extortion by PDVSA." Mem. Opp'n Mot. Summ. J., Doc. No. 113, at 45. But Illarramendi "does not tell the Court who threatened him, how he was threatened, when or where it occurred, nor does he provide any evidence beyond his own word that such threat ever occurred." *Illarramendi*, 260 F. Supp. 3d at 180. Thus, Illarramendi's "unsupported assertions" do not suffice to defeat the receiver's motion for summary judgment. *Id.* at 175.

Illarramendi also attempts to create genuine issues of material fact by asserting new facts in his opposition brief. Those assertions, he concedes, "conflict with [his] Guilty Plea in the Criminal Matter[,] including its Stipulation of Offense Conduct." Mem. Opp'n Mot. Summ. J., Doc. No. 113, at 4. Although Illarramendi tries to explain away the conflict by "certify[ing] . . . under penalty of perjury, that any discrepancies . . . are due to [his] ignorance or misunderstanding of pertinent facts, statues and/or jurisprudence at the time [he] made any stipulations or statements," *id.*, he cannot "show a triable issue of fact merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). In the absence of any "plausible explanation for discrepancies in [Illarramendi]'s

testimony,"[9] I conclude that Illarramendi's revised factual statements do not suffice to preclude summary judgment. *See Langman Fabrics*, 160 F.3d 106, 112 (2d Cir. 1998).

Because the material facts are established by operation of collateral estoppel, all that remains is to determine whether the receiver is entitled to judgment as a matter of law. I shall examine in turn each count on which the receiver seeks summary judgment.

### 1. *Counts One and Ten*

In Counts One and Ten, the receiver seeks to recover for actual fraudulent transfer under CUFTA and for conversion, respectively. The facts established by application of collateral estoppel could support either claim, but the causes of action are inconsistent. "[I]n order to set aside a fraudulent conveyance, one must be a *creditor* of the transferor," *Eberhard*, 530 F.3d at 129 (emphasis added), not an owner. Conversely, "[c]onversion is an unauthorized assumption and exercise of the right of *ownership* over property belonging to another, to the exclusion of the owner's rights," *Mystic Color Lab. v. Auctions Worldwide*, 284 Conn. 408, 418 (2007) (emphasis added), and "a claim for conversion may [not] be brought when the relationship . . . is one of debtor and creditor." *Id.* at 419 (2007). Because the "two remedies differ on . . . an essential element"—namely, whether the plaintiff need be a creditor or an owner—the remedies are "inconsistent, and the election to pursue one waives the other." *See In re Oswego Barge Corp.*,

---

[9] This is not a case where the stipulation contained "legal conclusion[s] that [Illarramendi] was not fully qualified to render." *Langman Fabrics v. Graff Californiawear*, 160 F.3d 106, 112 (2d Cir. 1998). To the contrary, the stipulation stated facts—e.g., whether documents were "bogus," "phony," or "fictitious," and whether he "agreed to pay kickbacks," *see* Plea Agreement, Doc. No. 98-5, at 13—that would have been unaffected by Illarramendi's supposed ignorance of the law. At any rate, Illarramendi's purported "mistaken legal understanding about what was owed to investors" is hardly a plausible explanation for the discrepancies in his testimony, because it is extremely "unlikely . . . that a manager of a hedge fund does not understand the rights of his investors to money they have invested." *See Illarramendi*, 260 F. Supp. 3d at 171 n.2.

664 F.2d 327, 343–34 (2d Cir. 1981) (Newman, J.); *Walcott v. Fallon*, 118 Conn. 220, 171 A. 658, 659 (1934). Therefore, the receiver cannot recover on both counts.

    a.   Count One: CUFTA

CUFTA provides that "a creditor . . . may obtain . . . [a]voidance of [a] transfer or obligation to the extent necessary to satisfy the creditor's claim," Conn. Gen. Stat. § 52-552h(a), when the transfer was "fraudulent" as defined by the statute. *See id.* at § 52-552e(a) ("A transfer made . . . by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made . . . and if the debtor made the transfer . . . [w]ith actual intent to hinder, delay or defraud any creditor of the debtor."). As the language of the statute indicates, "in order to set aside a fraudulent conveyance, one must be a creditor of the transferor." *Eberhard*, 530 F.3d at 129. The transferor himself (or a receiver who "stands only in the shoes of . . . [the] transferor") "may not bring an action to set aside his own fraudulent conveyance." *Id.* at 133.

As I previously have observed, a receiver has standing to bring claims under CUFTA when "he brings them on behalf of the receivership entities, which . . . became creditors of Illarramendi . . . at the commencement of his fraudulent scheme." *Carney v. Horion Invs.*, 107 F. Supp. 3d 216, 229 (D. Conn. 2015). That reasoning follows from the Second Circuit's decision in *Eberhard v. Marcu. See Horion Invs.*, 107 F. Supp. 3d at 228 (discussing *Eberhard*, 530 F.3d at 132–34). In *Eberhard*, the Second Circuit adopted the reasoning of the Seventh Circuit's decision in *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), and held that "when transfers are made by corporations that are completely controlled by the wrongdoer, 'the transfers were, in essence, coerced.'" *Horion Invs.*, 107 F. Supp. 3d at 229 (quoting *Eberhard*, 530 F.3d at 132). "The corporation then becomes the creditor in the coerced transaction and a receiver for the

coerced corporation has standing to claw back the transfers."[10] *Id.* Here, because Illarramendi

"made the [Receivership Entities] divert [money] to unauthorized purposes," the entities are

"entitled to the return of th[ose] moneys," and the receiver may assert a CUFTA claim against

Illarramendi on their behalf. *Eberhard*, 530 F.3d at 132 (quoting *Scholes*, 56 F.3d at 754).

In order to recover under CUFTA, "the Receiver must ultimately prove (1) that a transfer

of assets took place, (2) that the claim arose before that transfer took place, and (3) that the

transferor intended to hinder, delay or defraud the creditor by making the transfer." *Horion Invs.*,

107 F. Supp. 3d at 231. The first two elements are established by the Amended Declaration of

Brian Ong and its accompanying exhibits, *see* Docs. Nos. 106 & 107, the veracity of which

Illarramendi does not dispute. The third element is satisfied by the "Ponzi presumption," which

holds that "[a]ctual intent to defraud is presumed as a matter of law when the debtor is engaged

in a Ponzi scheme because 'transfers made in the course of a Ponzi scheme could have been

made for no purpose other than to hinder, delay or defraud creditors.'"[11] *Carney v. Lopez*, 933 F.

---

[10] The reason for that conclusion is explained more thoroughly in *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995): "The corporations, [the defendant] Douglas's robotic tools, were nevertheless in the eyes of the law separate legal entities with rights and duties. . . . [Douglas's] transfers removed assets from the corporations for an unauthorized purpose and by doing so injured the corporations. . . . Though injured by Douglas, the corporations would not be heard to complain as long as they were controlled by him, not only because he would not permit them to complain but also because of their deep, their utter, complicity in Douglas's fraud. . . The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys—for the benefit not of Douglas but of innocent investors—that Douglas had made the corporations divert to unauthorized purposes." *Id.* at 754.

[11] Illarramendi denies, as he has previously, that he was engaged in a Ponzi scheme. *See, e.g.*, Mem. Opp'n Mot. Summ. J., Doc. No. 113, at 27. I have held several times that Illarramendi "did, in fact, operate a Ponzi scheme," Sentencing Hr'g Tr., Ex. J to Fokas Decl., Doc. No. 96-10, at 93; *see also Carney v. Lopez*, 933 F. Supp. 2d 365, 380 (D. Conn. 2013) (observing that Illarramendi "has admitted to conduct described by many courts as amounting to a Ponzi scheme"), and I do so again here.

Supp. 2d 365, 379 (D. Conn. 2013) (quoting *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund)* 397 B.R. 1, 8 (S.D.N.Y. 2007)); *see also id.* at 381 ("[E]ntities used to further Ponzi schemes are presumptively insolvent."). Because the receiver has "show[n] that the transfers at issue were related to a Ponzi scheme," the Ponzi presumption establishes that Illarramendi acted with fraudulent intent. *Id.* at 381. Therefore, under the uncontested facts, the receiver is entitled to judgment as a matter of law on Count One of the Amended Complaint.

b. Count Ten: Conversion

As described above, "[c]onversion is an unauthorized assumption and exercise of the right of ownership over property belonging to another, to the exclusion of the owner's rights." *Mystic Color Lab*, 284 Conn. at 418. The tort of conversion has four essential elements:

(a) The plaintiff owned the property;

(b) The defendant deprived the plaintiff of that property for an indefinite period of time;

(c) The defendant's conduct was unauthorized; and

(d) The defendant's conduct harmed the plaintiff.

*See News Am. Mktg. In-Store v. Marquis*, 86 Conn. App. 527, 545 (2004). In the context of conversion, the notion of "ownership" has a "flexible meaning," and encompasses a "mere possessory right" as well as legal title. *Label Sys. Corp. v. Aghamohammadi*, 270 Conn. 291, 329 (2004). Thus, "a possessory interest sufficiently establishes standing to pursue a conversion action." *Payne v. TK Auto Wholesalers*, 98 Conn. App. 533, 541 (2006).

To the extent that the Receivership Entities owned the money wrongly transferred by Illarramendi, the receiver has established the elements of conversion as a matter of law.[12]

_____

[12] Under Connecticut law, "money, not just tangible goods, may be the subject of conversion," but the plaintiff "must show ownership or the right to possess specific, identifiable money, rather

Through his fraud, Illarramendi deprived the Receivership Entities of their money without authorization, causing them substantial losses. *See Illarramendi*, 2015 WL 8664174, at \*3 (holding that Illarramendi's fraud caused \$370,482,716 in losses); *cf. Lopez*, 933 F. Supp. 2d at 385 ("Illarramendi could not authorize . . . transfers enmeshed in his fraudulent scheme."). Hence, the receiver also is entitled to judgment as a matter of law on Count Ten.

### c.   Election of remedies

The problem is that the elements of fraudulent transfer and conversion are "clearly inconsistent" with one another, *see Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 130 (2d Cir. 2009), and "[t]he law simply does not . . . permit a party to exercise two alternative or inconsistent . . . remedies." *Lucente v. IBM Corp.*, 310 F.3d 243, 258–59 (2d Cir. 2002). As the Supreme Court has stated, "the doctrine of election of remedies . . . refers to situations where an individual pursues remedies that are legally or factually inconsistent." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 50 (1974). In such circumstances, prevailing upon one inconsistent cause of action "deprives [the plaintiff] of any right to resort to the other." *Equitable Tr. Co. of N.Y. v. Conn. Brass & Mfg. Corp.*, 290 F. 712, 725–26 (2d Cir. 1923) ("*Equitable I*").

Here, the elements of the receiver's CUFTA claim and of his conversion claim are "irreconcilable." *See Equitable Tr. Co. of N.Y. v. Conn. Brass & Mfg. Corp.*, 10 F.2d 913, 915 (2d Cir. 1926) ("*Equitable II*"). The CUFTA claim requires the Receivership Entities to be "creditors," that is, those "to whom a debt is owed." *Black's Law Dictionary* (10th ed. 2014); *cf.* Conn. Gen. Stat. § 52-552b(4) (defining "creditor" as "a person who has a claim"). The

---

than the right to the payment of money generally." *Mystic Color Lab. v. Auctions Worldwide*, 284 Conn. 408, 421 (2007). That requirement seems to be met because the Receivership Entities appear actually to have had legal title to the investments; Illarramendi was not "merely obligated to pay the money." *See Deming v. Nationwide Mut. Ins. Co.*, 279 Conn. 745, 772–73 (2006).

conversion claim, conversely, requires the Receivership Entities to be "owners," that is, those "who ha[ve] the right to possess, use, and convey something," and "in whom one or more interests are vested." *Black's Law Dictionary* (10th ed. 2014). The two claims are brought with respect to the same transfers, and obviously, the Receivership Entities cannot simultaneously own and be owed the same property. Thus, the two causes of action are "plainly inconsistent" with respect to "an essential element," *see In re Oswego Barge Corp.*, 664 F.2d at 343, and "the election to pursue one waives the other." *Walcott*, 171 A. at 659.

A useful illustration of the principle is contained in the 1923 case of *Equitable Trust Co. of New York v. Connecticut Brass & Manufacturing Corp.* There, the United States (as intervenor) alleged that it had contracted with the defendant to supply munitions for use in World War I. In order to manufacture the munitions, the United States provided the defendant with more than two million pounds of copper, title to which was to remain with the United States. The defendant only used about one-third of the copper, failed to return the remainder, and soon became insolvent. The United States filed suit for payment of a debt in the amount of the copper's fair market value, asserting that its claim was entitled to priority under a federal statute. After it lost in the district court, the United States changed its theory to assert a "lien . . . upon the proceeds realized from the wrongful conversion of the property." *Equitable I*, 290 F. at 724.

The Second Circuit held that the conversion claim was barred by the doctrine of election of remedies. By "seeking relief as a creditor," the Court reasoned, "the United States . . . proceeded upon the theory that the title to the copper had been transferred from it to the defendant corporation." *Id.* at 725. "Having proceeded upon that theory in the court below, and failed, it is now unable . . . to shift its position absolutely and argue that the title continued to be throughout the whole time in the [United States]," such that the government may "now claim[ ] a

lien upon the assets" from the conversion. *Id.* Even though the United States either "could proceed upon the theory of ownership of the copper in itself and sue for the recovery of it," or "waiving ownership of the copper, . . . might sue as a creditor to recover the debt," it could not do both. *Id.* "The two methods of redress are based on inconsistent theories," for "[a]ll actions which proceed upon the theory that title to the property is in the claimant are substantially inconsistent with those which proceed upon the theory that title is in the defendant." *Id.* Because the government had "actually made [a choice] between inconsistent theories and remedies," the Court held, it would "not be allowed to invoke the aid of the court upon contradictory principles of redress upon one and the same line of acts." *Id.* "The assertion of the one remedy preclude[d] a resort to the other which [was] inconsistent with the claim first made." *Id.* at 726.

To be sure, the doctrine of election of remedies has less applicability now than it did in 1923, because the Federal Rules of Civil Procedure (enacted in 1938) now permit plaintiffs to "plead alternative and even inconsistent theories, . . . even if they only can recover under one of th[o]se theories." *Obourn v. Am. Well Corp.*, 115 F. Supp. 3d 301, 311 (D. Conn. 2015) (brackets omitted) (citing Fed. R. Civ. P. 8(d)); *see St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 183 (E.D.N.Y. 2010) ("Rule 8(d) ameliorates the uncertainty inherent in all litigation at the pleading stage by permitting plaintiffs to allege claims in the alternative, even if the legal theories underlying those claims are technically inconsistent or contradictory."). But it "does not follow" from the plaintiff's "right to plead alternative causes of action based on the same facts . . . that a plaintiff may recover twice for the same wrong." *Coppola Constr. Co. v. Hoffman Enters. Ltd. P'ship*, 134 Conn. App. 203, 210 n.4 (2012), *aff'd*, 309 Conn. 342 (2013); *cf. Treglia v. Zanesky*, 67 Conn. App. 447, 456 (2001) ("The plaintiff . . . mistakes a party's right to plead alternate theories of liability with a right to seek inconsistent remedies that could result in double

recovery."). Even though a plaintiff undoubtedly may "*plead* alternative, or even inconsistent, claims," courts continue to hold that plaintiffs eventually "need to make an 'election'" to avoid doubly "*recover*[ing] on" such claims. *In re Gen. Motors Ignition Switch Litig.*, 257 F. Supp. 3d 372, 405–06 (S.D.N.Y. 2017); *see Treglia*, 67 Conn. App. at 456 (affirming trial court's decision requiring plaintiff to make an election "after all evidence had been presented").

Here, the receiver's claims for conversion and for violation of CUFTA are contradictory for the reasons discussed in *Equitable I*. "All actions which proceed upon the theory that title to the property is in the claimant are substantially inconsistent with those which proceed upon the theory that title is in the defendant." *Equitable I*, 290 F. at 725. A conversion claim "proceed[s] upon the theory that title to the property is in the claimant"—that is, that the Receivership Entities own the money.[13] *See id.*; *cf. Mystic Color Lab*, 284 Conn. at 418 ("Conversion is an unauthorized assumption and exercise of the right of *ownership* over property belonging to another, to the exclusion of the *owner's* rights.") (emphasis added). A CUFTA claim "proceed[s] upon the theory that title is in the defendant"—that is, that Illarramendi owns the money—and that the plaintiff is a "creditor [entitled] to recover the debt." *See Equitable I*, 290 F. at 725; *cf. Eberhard*, 530 F.3d at 129 ("[I]n order to set aside a fraudulent conveyance, one must be a *creditor* of the transferor . . . .") (emphasis added). Because the Receivership Entities cannot simultaneously own and be owed the same money, the claims "are based on inconsistent

---

[13] "The word owner is one of flexible meaning" under Connecticut law, and "a possessory interest sufficiently establishes standing to pursue a conversion action." *Payne v. TK Auto Wholesalers*, 98 Conn. App. 533, 541 (2006). Therefore, a secured creditor may bring a conversion action, because "a secured creditor . . . [has] the right to take possession of the secured property upon the debtor's default." *See United States v. Whiting Pools*, 462 U.S. 198, 206 n.14 (1983) (citing U.C.C. § 9-503); *cf. William Goldberg & Co. v. Cohen*, 219 Ga. App. 628 (1995) ("A secured creditor has a right of action for conversion if property subject to its security interest is disposed of without the creditor's authorization."). There is no suggestion here, however, that the Receivership Entities may be considered secured creditors.

theories." *Equitable I*, 290 F. at 725. By "elect[ing] to resort to one of th[o]se remedies," the receiver "thereby deprives himself of any right to resort to the other." *Id.*

As explained above, the receiver has viable claims both for violation of CUFTA and for conversion. Therefore, I shall permit the receiver to make an election between those claims. Within ten days of the filing of this order, the receiver shall file a notice on the docket announcing which claim he will pursue. The receiver shall support his choice with an affidavit or other evidence sufficient to show who owns the funds at issue. Illarramendi may respond to that submission within two weeks. If the evidence properly supports the receiver's chosen theory, then I will direct the Clerk to enter judgment for the receiver on the appropriate cause of action.

### 2. *Count Six: Breach of fiduciary duty*

In order to prove a claim for breach of fiduciary duty, "the plaintiff . . . ha[s] the burden of establishing four essential elements." *Rendahl*, 173 Conn. App. at 100. He must show that:

> (1) a fiduciary relationship existed that gave rise to a duty of loyalty, i.e., an obligation to act in good faith and in the best interests of the plaintiff;
>
> (2) the defendant advanced his or her own interests to the detriment of the plaintiff;
>
> (3) the plaintiff sustained damages; and
>
> (4) the damages were proximately caused by the fiduciary's breach of his or her fiduciary duty.

*See id.* "Once a fiduciary relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary," who must satisfy that burden by "clear and convincing evidence." *Oakhill Assocs. v. D'Amato*, 228 Conn. 723, 726 (1994).

Connecticut courts "broadly define[] a fiduciary relationship" as one "characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge,

skill or expertise and is under a duty to represent the interests of the other." *Culhane v. Culhane*, 969 F. Supp. 2d 210, 225 (D. Conn. 2013) (quoting *Dunham v. Dunham*, 204 Conn. 303, 322 (1987)). A fiduciary "may be under a specific duty to act for the benefit of another" by operation of law, or he may simply be "in a dominant position, thereby creating a relationship of dependency." *See Hi-Ho Tower v. Com-Tronics, Inc.*, 255 Conn. 20, 38 (2000). By contrast, a fiduciary relationship does not exist when parties "deal[] at arms length, thereby lacking a relationship or dominance and dependence," or where they are "not engaged in a relationship of special trust and confidence." *Id.* at 39.

In the present case, Illarramendi has conceded that he "acted as an investment adviser" to the Receivership Entities. Plea Agreement, Doc. No. 98-5, at 13. As noted, Connecticut courts have concluded that a defendant who "acts as an investment advisor" is part of a "relationship . . . [that] is fiduciary in nature." *Iacurci*, 313 Conn. at 804. Hence, "a fiduciary relationship existed" between Illarramendi and the Receivership Entities, and Illarramendi was obligated to "act in good faith" and "in the [funds'] best interests." *See Rendahl*, 173 Conn. App. at 100.

Because the receiver has shown the existence of a fiduciary relationship, "the burden of proving fair dealing . . . shifts" to Illarramendi. *D'Amato*, 228 Conn. at 726. He has not carried that burden. To the contrary, Illarramendi admitted under oath that he "made materially false and misleading representations and omissions to investors," Plea Agreement, Doc. No. 98-5, at 13, "engaged in transactions that were not in the best interests of the Funds," *id.*, and "received more in management fees than he was entitled." *Illarramendi*, 260 F. Supp. 3d at 173 (citing TRO Hr'g Tr., Doc. No. 260, at 385). Illarramendi's "self-dealing" and failure to "act in the best interest of the [funds] . . . clearly constitute[] a breach of fiduciary duty." *Spector v. Konover*, 57 Conn. App. 121, 132 (2000); *cf. Charter Oak Lending Grp. v. August*, 127 Conn. App. 428, 442

(2011) ("Self-dealing is defined as '[p]articipation in a transaction that benefits oneself instead of another who is owed a fiduciary duty.'") (quoting Black's Law Dictionary (9th ed. 2009)).

As a proximate result of Illarramendi's fraud, the funds sustained approximately $370,482,787 in damages. *See Illarramendi*, 2015 WL 8664174, at *3. That injury would not "have occurred but for [Illarramendi]'s conduct," and Illarramendi's "conduct [was] a substantial factor in bringing about the [funds'] injuries." *Bozelko v. Papastavros*, 323 Conn. 275, 283 (2016). Although Illarramendi reiterates his argument that "there is no loss in the Receivership Companies" because the claim by PDVSA "is invalid and fraudulent, or at least overvalued," *see* Mem. Opp'n Mot. Summ. J., Doc. No. 113, at 36–37, I exhaustively entertained that theory at the sentencing and restitution hearings. *See* Sentencing Hr'g Tr., Doc. No. 96-10, at 11–78; *see generally* Restitution Hr'g Tr., Doc. No. 187, *United States v. Illarramendi*, 3:11-cr-00041 (SRU). I determined that "even if I were to apply the highest standard in law"—beyond a reasonable doubt—"the [amount of loss] . . . in this case is not zero," but rather "almost certainly [was] in excess of 200 million dollars." Sentencing Hr'g Tr., Doc. No. 96-10, at 67, 72. Thus, I "completely reject[ed]" Illarramendi's position. *Id.* at 67. I see no reason to permit Illarramendi to reargue this point a third time, after I already heard lengthy argument from him and his counsel and allowed him to extensively cross-examine the receiver's expert.

The facts established by application of collateral estoppel demonstrate as a matter of law that Illarramendi breached his fiduciary duties to the Receivership Entities. Therefore, I grant the receiver's motion for summary judgment with respect to Count Six of the Amended Complaint.

3. *Count Seven: Unjust enrichment*

"Unjust enrichment is a very broad and flexible equitable doctrine that has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that

has come to him at the expense of the plaintiff." *Gagne v. Vaccaro*, 255 Conn. 390, 409 (2001). A plaintiff seeking to recover for unjust enrichment must prove that:

      (a)  the defendant was benefited;

      (b)  the defendant unjustly did not pay the plaintiff for the benefits; and

      (c)  the lack of payment was to the plaintiff's detriment.

*See Trenwick Am. Reins. Corp. v. W.R. Berkley Corp.*, 138 Conn. App. 741, 754 (2012). The plaintiff bears the burden to prove the elements of unjust enrichment. *See id.*

      In *Carney v. Lopez*—another case arising out of Illarramendi's Ponzi scheme—I held that the receiver had "sufficiently pleaded a claim for unjust enrichment" by "alleg[ing] that the defendants received payments, that they were not entitled to those payments, and that they received those benefits at the expense of the receivership entities." 933 F. Supp. 2d at 384. In conjunction with the facts established through collateral estoppel, the same analysis shows that the receiver is entitled to judgment as a matter of law here. As a result of Illarramendi's illegal Ponzi scheme, he made approximately $25,844,834 in payments to which he was not entitled. *See Illarramendi*, 2015 WL 8664174, at *4. Those payments were obtained at the expense of the Receivership Entities, the victims of Illarramendi's fraud. I conclude that "[i]t contrary to equity and good conscience for [Illarramendi] to retain payments . . . in substantial excess of what he was entitled to retain." *See Cobalt Multifamily Investors I v. Shapiro*, 9 F. Supp. 3d 399, 412 (S.D.N.Y. 2014); *accord Town of Stratford v. Castater*, 136 Conn. App. 522, 534 ("[U]njust enrichment results when it is contrary to equity and good conscience for the defendant to retain a benefit which has come to him at the expense of the plaintiff.") (internal quotation marks omitted). Accordingly, I grant the receiver's motion for summary judgment with respect to Count Seven of the Amended Complaint.

4. *Count Eleven: Money had and received*

An action for indebitatus assumpsit (money had and received) "is the equivalent of the more modern action for unjust enrichment." *Gold v. Rowland*, 296 Conn. 186, 202 n.15 (2010). Although the cause of action seems largely to have been supplanted by unjust enrichment, the Connecticut Appellate Court has analyzed a number of claims for money had and received in recent years, suggesting the continued vitality of the doctrine. *See, e.g.*, *Town of Stratford v. Wilson*, 151 Conn. App. 39 (2014); *Castater*, 136 Conn. App. at 529 ("An action for money had and received has an ancient pedigree."). In order to recover on a such a claim, "the plaintiff must demonstrate that the defendant received money belonging to the plaintiff, and benefitted from receipt of that money." *Carney v. Montes*, 2014 WL 671263, at *12 (D. Conn. Feb. 21, 2014).

For the same reasons discussed above with respect to the receiver's unjust enrichment claim, the undisputed facts demonstrate as a matter of law that "the plaintiff . . . in equity in good conscience [is] entitled to the money." Therefore, I grant the receiver's motion for summary judgment with respect to Count Eleven of the Amended Complaint.

C.  What are the appropriate remedies?

The receiver's damages are detailed in the Amended Declaration of Brian Ong and its accompanying exhibits. *See* Docs. Nos. 106 & 107. In summary, the receiver seeks damages for:

(1) $2,276,594.07 in purported "salary" and "bonus" payments for Illarramendi from Receivership Entities during 2006, 2007, and 2008;

(2) $1,222,027.00 in purported "partnership distributions" from Receivership Entities between December 2006 and January 2010;

(3) $184,633.56 in payments from Receivership Entities to pay mortgage and maintenance payments for Illarramendi's 41-foot Meridian luxury yacht between November 2007 and January 2011;

(4) $3,112,000.00 in undocumented purported "loans" to Illarramendi
from Receivership Entities between February 2007 and September
2010;

(5) $5,260,427.00 in transfers from Receivership Entities to pay
Illarramendi's personal tax liabilities between May 2009 and October
2010;

(6) $3,275,000.00 in transfers from Receivership Entities to Karp Builders
to construct and innovate Illarramendi's luxury home between August
2008 and May 2009;

(7) $9,683,034.62 in other direct and indirect payments from Receivership
Entities to Illarramendi or for Illarramendi's benefit between
November 2005 and September 2010.

*See generally* Am. Ong Decl., Doc. No. 106. In total, the receiver seeks $25,013,716.25. *Id.*

The illegitimate payments to Illarramendi or for his benefit are thoroughly documented
by the receiver's declaration and exhibits, and Illarramendi does not specifically challenge any of
them. The amount of damages sought by the receiver also roughly equals the approximately $26
million in "profits [Illarramendi] made from his illegal scheme" that I previously ordered
Illarramendi to pay as part of his criminal case. *See Illarramendi*, 2015 WL 8664174, at *4. I
again find that the receiver's "methodology . . . is [ ] fair and reasonable," and I adopt the
Amended Declaration of Brian Ong and its accompanying exhibits as the findings of the court.
Accordingly, I hold Illarramendi liable to the Receivership Entities for a total of $25,013,716.25,
on the receiver's claims.

## IV.    Conclusion

I grant the receiver's motion for summary judgment with respect to Counts Six, Seven,
and Eleven of the Amended Complaint. I also grant the receiver's motion with respect to Count
One or Count Ten, but not both.

Within ten days of the date of this order, the receiver shall file a notice on the docket—accompanied by the required evidentiary submission—that states whether he elects to pursue Count One or Count Ten of the Amended Complaint. After I have reviewed that submission and any response from Illarramendi, I will direct the Clerk to enter judgment for the receiver against Illarramendi on the appropriate claims in the appropriate amount, and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 26th day of March 2018.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge